424 F.Supp. 1194 (1976)
CARR CENTRAL NEIGHBORHOOD CORPORATION et al., Plaintiffs,
v.
U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT et al., Defendants.
No. 74-385C(2).
United States District Court, E. D. Missouri, E. D.
November 4, 1976.
Samuel H. Liberman, St. Louis, Mo., for plaintiff s.
Joseph Moore, St. Louis, Mo., for defendants.

MEMORANDUM OPINION
REGAN, District Judge.
By their complaint in this action plaintiffs seek to enjoin the United States Department of Housing and Urban Development (HUD), its Secretary and two other HUD officials from expending federal *1195 funds for the "convention center" of the City of St. Louis (now nearing completion) in the DeSoto-Carr Urban Renewal Project Area (Area) and to require defendants to issue to plaintiff Carr Extension Redevelopment Corporation (Redevelopment Corporation) a commitment for mortgage loan insurance and rent subsidies for its proposed Carr Apartments project in the Area.[1]
This suit concerns only two relatively small portions of the approximately 370 acres in the Area, one portion being referred to as Tract A and the other as Tract B. The matter has been submitted upon a stipulation of facts as supplemented by agreement of the parties. The convention center is being constructed on Tract A, some nine blocks distant from the proposed Apartment project. Individual plaintiffs are former residents of housing which was cleared from Tract B and who were relocated in nearby housing outside the Area. Each of them has received all required relocation benefits, including Replacement Housing Payments. They either wish to move back into the Area and become tenants of the Carr Apartments proposed to be built on Tract B or simply have a continuing interest in the proper residential development of the Area. Carr Central Neighborhood Corporation, the other corporate plaintiff, is a Missouri Not-for-Profit corporation. Carr Central's original corporate purposes were: "To act on programs that will bring moneys and improvements into the neighborhood, as well as to act on problems and conditions existing in the neighborhood; to encourage people in the neighborhood to become interested in their own problems and to find ways to solve them." However, by a Certificate of Amendment issued April 14, 1971, the foregoing purpose clause was expressly deleted and in its place the following clause was substituted: "The corporation is organized exclusively for charitable and educational purposes, including for such purposes, the making of distributions to organizations that qualify as exempt organizations under § 501(c)(3) of the Internal Revenue Code of 1954."[2] As for Redevelopment Corporation, it was formed under the provisions of the Missouri Urban Redevelopment Corporation Law (Ch. 353, R.S.Mo.). Although the parties have stipulated that its unstated purpose is to "sponsor" the development of the Carr Apartments, it is not so limited under its Articles of Incorporation or by the law. However, its net earnings derived from any redevelopment project is limited to eight per cent upon the entire cost thereof.
The St. Louis Land Clearance for Redevelopment Authority (Authority) was created by an ordinance enacted pursuant to the Missouri Land Clearance for Redevelopment Authority Law (Section 99.300 et seq. R.S.Mo.), to administer local urban redevelopment programs in the City of St. Louis. It has broad powers under that law, including, inter alia, the power to propose and recommend redevelopment plans and urban renewal plans to the governing body of the City and the power to acquire, hold and sell real property for purposes consistent with the Law. It is not a defendant in this action.
Prior to June 10, 1970, the Area was declared blighted or insanitary and in need of redevelopment or rehabilitation by the governing body of the City of St. Louis, this being a necessary condition precedent under the law to the preparation of a redevelopment *1196 or urban renewal plan by the Authority. Following such declaration (and also prior to June 10, 1970), the Authority prepared an Urban Renewal Plan (Plan) for the Area which, after its submission to the St. Louis Plan Commission, was duly submitted to the governing body of the City. The Plan expressly states that the "Area is not predominantly residential in character," although "(t)he projected residential development will be planned to provide housing for low and moderate income families and individuals."
After a public hearing on the Plan was held in accordance with the state law, the governing body of the City approved the Plan and the Authority (the Agency which is authorized to administer the federal programs which are the subject matter of this litigation) was authorized to and did apply to defendants for financial assistance under the Neighborhood Development Program law. 42 U.S.C., Section 1469. On or about June 10, 1970, HUD approved the application and the Plan and entered into a contract with the Authority for temporary loans and grants-in-aid with which to implement the Plan. The Project has since been funded by HUD on an annual basis pursuant to the Neighborhood Development Programs statute.
With this background statement we address ourselves to the matters directly at issue. The memoranda filed by the parties are quite extensive and cover a broad range. However, the decisive facts and the issues to be resolved are relatively few and uncomplicated. In essence, what plaintiffs contend is (1) that HUD is mandatorily required to provide mortgage insurance for a loan which would enable Redevelopment Corporation to construct the Carr Apartments on Tract B as a Section 221(d)(3) low-income housing project, even though in the opinion of HUD that apartment project does not now meet underwriting standards for mortgage insurance, and (2) that the convention center of the City of St. Louis is not a permitted use for Tract A under the Plan as originally approved.
We first consider plaintiffs claim respecting the Carr Apartments project. As noted supra, Tract B constitutes only a small part of the total acreage included in the Area. It was acquired and cleared by Model Housing Development Corporation, a corporation formed and funded with Model City Agency funds for the purpose of planning, assisting and carrying out all housing programs in the Model City Program for St. Louis. It is not a party to this action. Authority played no part in the acquisition or clearing of the tract. In September, 1971 an application for a feasibility letter for mortgage insurance pursuant to Section 221(d)(3) of the National Housing Act (Section 1715l (d)(3), 12 U.S.C.) was submitted to the Federal Housing Administration (FHA) by Carr Central and AME Church Extension Department,[3] (Elijah Parish Lovejoy Presbytery), as co-sponsors of the project. On November 5, 1971, a feasibility letter was issued by the Area Director of HUD to Carr Central and AME Church Extension Department, and they were invited to submit, through their mortgagee, an application for a conditional commitment for project-mortgage insurance, subject to certain listed special conditions (including proper security protection, FHA approval of the project management program, an affirmative marketing plan, and a complete progress schedule for the project site).
The feasibility letter stated, inter alia, that the insurable mortgage would not exceed $1,142,500 ("the maximum project cost supportable by the economics of the proposal") and that the construction budget (including the builder's general overhead and profit) of $910,985 was "the upper limit available for construction recognized by FHA." It contained the further explicit statement that "(t)his letter will expire if you fail to submit your application [for a conditional commitment] with the required fee within 90 days of the date hereon." On February 1, 1972, the feasibility letter was extended an additional 30 days.
There is no evidence that any application for a conditional commitment for mortgage *1197 insurance was submitted prior to the expiration of the period specified in the feasibility letter as extended. Redevelopment Corporation did not come into existence until March 30, 1972, which was after the feasibility letter, as extended, had expired. About April, 1972, the Valuation Section of the Technical Standards Branch of the St. Louis Area Office of HUD concluded that the project was economically infeasible and recommended that it be classified as ineligible until certain conditions were changed.
On June 29, 1973, over a year after the feasibility letter had expired, Carr Central and Elijah Lovejoy Presbytery, again as co-sponsors of the project, were parties to an application for a conditional commitment. The record is silent as to the reason for the long delay. We note that although the feasibility letter had limited an insurable mortgage to $1,142,500, the application sought insurance for a mortgage in the amount of $1,293,742. So, too, the project construction budget as set forth in the application far exceeded "the upper limit available for construction recognized by FHA." There are a number of other discrepancies, none of which are explained or sought to be justified. In addition, there is no showing that any of the special conditions subject to which the feasibility letter was issued were met.
On November 13, 1973, after a review of the findings of the Office of Technical and Credit Standards respecting the feasibility of the proposed project, HUD wrote plaintiff's attorney to the effect that it had rejected the request for a conditional commitment. Theretofore, HUD had cancelled its "reservation of rent supplement contract authority" which had been requested by "AME Church Extension Dept.," as "sponsor" of the Carr Apartments Project.
As we view the facts, the narrow issue presented is simply whether HUD is obligated under the law to commit government mortgage insurance for the construction of the proposed project. Granted that the national housing policy is to provide decent housing for every American family and that particular emphasis is placed on suitable housing for low and moderate income families and displaced families, it does not follow that the implementation of this policy requires that every application for mortgage insurance be approved without regard to the merits of the particular project or the likelihood of default.
Even plaintiffs concede, as they must, that broad grants of discretion to HUD as to whether to approve mortgage insurance applications are necessary in order to protect the solvency of the General Insurance Fund. They contend, however, that there are "extraordinary circumstances" in the present case which necessitate that mortgage insurance be committed for the Carr Apartments project. Inter alia, they argue (1) that the effect of the rejection of the application is to "circumvent procedural and substantive requirements" imposed upon HUD by statute, and (2) that the decision to withhold the mortgage insurance constitutes a "departure from established policies" of the agency.
We do not agree. Not only is HUD without authority or funds to build housing, it has not taken any action which would preclude the use of Tract B for residential purposes. The fact that one or more applications for mortgage insurance have not been approved[4] does not prove that no application in the Area would meet HUD's underwriting requirements. And more importantly, we may not fault HUD for refusing to approve a particular project for mortgage insurance where, as here, it reasonably found that as of the time of such rejection its requirements had not been met. A mortgage may not be accepted for *1198 insurance absent a finding that the project with respect to which the mortgage is executed is economically sound.
The Carr Apartments proposal was rejected because the project was economically infeasible in view of the high rents the location and market deficiencies, so than a default on the mortgage loan would likely result. And since Redevelopment Corporation has a paid-in capital of not more than $500, there is no certainty (and no evidence) that sufficient additional funds would be available to meet the construction costs which we judicially know are continually rising or to protect the Insurance Fund in the event of default. There is an entire want of any evidence respecting either the financial resources or the management ability of either of the named sponsors of the project.[5] We add that apartment projects do not manage themselves, and there is no showing that Redevelopment Corporation or the "sponsors" have either the present or potential ability to cope with the management problems reasonably to be anticipated in this particular project.
In spite of plaintiffs' protestations to the contrary, Tract B remains available for housing for low and moderate income families. Another private developer, with demonstrated management ability and with more resources and a greater financial stake in the success of the venture than the $42 cash investment set forth in Carr Central's application, and with additional financial commitment from the outside community, may well be able to obtain mortgage insurance in an amount which would make the project less risky. Moreover, by reason of the demolition and clearing of the Pruitt-Igoe Projects (of which we take judicial notice), the construction of the convention center and the Convention Plaza, and other activity in the Area, it is quite possible that some of the adverse environmental factors which played a part in the 1973 rejection may by now no longer be present.
HUD breached no statutory duty by its 1973 rejection of the specific proposal for Carr Apartments. There are no "extra-ordinary circumstances" which mandated that mortgage insurance be then committed for the infeasible Carr Apartments project. Having so found the facts, we deem it unnecessary to rule the mooted issues of the scope of judicial review of the actions of HUD in rejecting the proposal or the standing of the parties (in particular the individual plaintiffs) to litigate such rejection.
We next consider the issues relating to the Convention Center located on Tract A. Under the Plan as approved, Tract A was designated as "commercial," and all commercial uses as defined in the Plan are permitted. In describing the land use categories, the Plan as originally adopted provided:
"Commercial usage, as shown on the Land Use Plan shall permit development to serve the residents of the project area and city in general. The proposed zoning shall be `G' Commercial and `H' Commercial and `L' Jefferson Memorial Districts, where applicable. Uses permitted within this district shall include retail stores and shops, personal service establishments, office buildings, automotive service stations, wholesale business and storage warehouses, laundries, printing shops, dyeing and cleaning works, auto body shops, theaters, hotels and motels, nursing and convalescent homes, and uses incidental to the above."
Tract A was acquired by the Authority and was subsequently sold to the City of St. Louis (not a party to this action) which, as a public redeveloper, proposed to develop the land as a convention center. The Authority determined that such use was consistent with the original Plan, and after finding that it served the residents of the area and the City in general approved the City's proposal. On November 7, 1972, the voters of the City approved the issuance of bonds for *1199 the construction of the center.[6] There is no evidence that any of plaintiffs voiced objection to the convention center project until they filed this suit on May 31, 1974.
Plaintiffs contend that the use of Tract A as a convention center constitutes a substantial modification of the Plan as to which a prior public hearing was required but was not held. Obviously, that contention is based on the premise that the authorized use of the building is inconsistent with the definition of "Commercial use." Their position is that the only uses permitted are those specifically enumerated. The Plan does not so provide. It expressly states that the zoning applicable shall be "G" Commercial, "H" Commercial and "L" Jefferson Memorial District, obviously referring to the City's Zoning Code.
There can be no question but that a convention center is a permitted "commercial" use under the St. Louis Zoning Code, unless, as argued by plaintiffs, without citation of authority, the words "shall include" necessarily restrict the permissible commercial uses to those enumerated. However, the meaning of the word "include" is not ordinarily as limited as plaintiffs contend. To the contrary, the word is generally employed as a term of enlargement, not of limitation. See 42 C.J.S. Include, p. 525. And as held in St. Louis County v. State Highway Commission, 409 S.W.2d 149, 153 (Mo.1966): "When used in connection with a number of specified objects [the word] implies that there may be others which are not mentioned." See also, on the ordinary understanding of the term, United States v. Gertz, 249 F.2d 662, 666 (9 Cir. 1957); Federal Land Bank of St. Paul v. Bismarck Lumber Co., 314 U.S. 95, 100, 62 S.Ct. 1, 86 L.Ed. 65 (1941); and Argosy Limited v. Hennigan, 404 F.2d 14 (5 Cir. 1968).
The Missouri case is particularly instructive, not only because the Plan was undoubtedly drafted in light of the Missouri interpretation of the language employed but by reason of the underlying similarity of usage of the word "include." That case involved the construction of a bond issue proposal as submitted to the voters. The proposition stated that the bonds were to provide funds for the construction of "highways," said highways to "include" certain specified highways. The Court held that the funds could be used for other than the highways specified.
Here, the Plan authorizes all uses permitted in the zoning districts therein listed. If the intention was to restrict the uses to those enumerated in the "shall include" clause, all that would have been necessary would have been to set forth such uses as the only ones permitted. According the words "shall include" their ordinary and generally accepted meaning, we reject plaintiffs' contention that a "convention center" could not be authorized without the prior public hearing which would have been required had there been a "substantial modification" of the Plan within the meaning of the Redevelopment Authority Law (Section 99.430(8) R.S.Mo.). The Authority's determination that the use of Tract A as a "convention center" was consistent with the original Plan and that it served the residents of the Area and the City in general has not been demonstrated to be erroneous. In addition, the parties in interest (e. g., the City of St. Louis and the Authority) were not made parties to this action and so had no opportunity to be heard, although they are the parties who would be adversely affected by a judgment for plaintiffs. We hold, on the merits, that plaintiffs cannot prevail.
*1200 We are also of the opinion that plaintiffs are not within the zone of interests protected by any applicable statute, and so lack standing to complain of the site acquisition and construction of the convention center. Obviously, none of plaintiffs have suffered any economic harm by the use being made of Tract A. Whatever may have been the situation had not its original purpose clause been deleted, Carr Central, as a corporation operating exclusively for charitable and educational purposes, could not possibly be adversely affected by the alleged "modification" of the Plan as to Tract A without a public hearing. Cf. Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); United States v. SCRAP, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); and Coalition for the Environment v. Volpe, 504 F.2d 156 (8 Cir. 1974). So, too, Redevelopment Corporation, which is alleged to be the sponsor of the Carr Apartments housing proposal for Tract B, has not shown how it was injured by the convention use being made of Tract A, and this is particularly true in view of HUD's rejection of the application for mortgage insurance. As for the individual plaintiffs, we are not persuaded that their "desire to see the Area rebuilt as a pleasant residential area with nearby shopping facilities" suffices to create such a personal interest or stake in the use of Tract A as a convention center as to entitle them to an injunction.
The foregoing memorandum opinion constitutes our findings of fact and conclusions of law. Judgment will be entered in favor of defendants and against plaintiffs on all counts of the complaint.
NOTES
[1] In their memorandum and proposed findings, plaintiffs make the further contention that the alleged derelictions of defendants as to the DeSoto-Carr Project are so gross and of such a nature that although such relief was not specifically mentioned in the Complaint, defendants should also be enjoined from providing any financial aid whatsoever for any and all urban renewal projects in the City of St. Louis until the convention center plan is abandoned and the mortgage insurance commitment for Carr Apartments is issued.
[2] The fact that Carr Central is organized exclusively for charitable and educational purposes raises serious questions both as to ultra vires conduct and as to its standing in this action. We add that the mere fact that Carr Central "selects" one-half of the (nine or five) directors of Redevelopment Corporation would appear to be immaterial. Only the stockholders (and owners of income debenture certificates, if any are issued) have the right under Missouri law to elect directors.
[3] The AME Church Extension Department has not joined in this action.
[4] The parties have stipulated that two other proposed housing projects in the Area (but not for Tract B) had been "cancelled" in September, 1972, after initial letters of feasibility had theretofore been issued. The technical personnel of the Area Office and Region "had consistently maintained these projects [including Carr Apartments] did not meet underwriting requirements, and should not be approved." After a review of the proposals and the problems relating to these projects, HUD concluded they were "infeasible due to the unmarketable rents and operational expenses."
[5] As we have indicated in footnote 1, supra, it is not at all clear that, whatever may have been the original motivations of its incorporators, Carr Central, a not-for-profit corporation, could legally sponsor such a commercial undertaking in view of its corporate limitation to "charitable and educational purposes" exclusively. And the record is devoid of any evidence concerning the right or ability of the Presbytery to undertake the project.
[6] The phrase "convention center" is merely a shorthand way of referring to the St. Louis Convention, Exhibition and Community Center Building. Its use will not be confined to conventions. Rather, as approved by the voters, it is to be used "for the holding of public meetings, gatherings and conventions for discussions of public questions" and as a "meeting and exhibition place for education, art, science, moral, musical, industrial, commercial, labor and other purposes." It must not be overlooked that the convention center is actually an integral part of a more ambitious Convention Plaza project (privately financed) for the construction both to the east and to the west of the center of a shopping mall, hotels, office buildings and garages.