TENANTS' COUNCIL OF TIBER IS-LAND–CARROLLSBURG SQUARE, Appellant,

v.

James LYNN, Individually and in his capacity as Secretary of Housing and Urban Development, et al.

No. 71–1931.

United States Court of Appeals, District of Columbia Circuit.

Argued May 23, 1972.

Decided Dec. 10, 1973.

As Amended Dec. 20, 1973.

Rehearing Denied Jan. 15, 1974.

B. Michael Rauh, Washington, D. C., with whom Martin Shulman, Washington, D. C., was on the brief, for appellants.

Paul L. Friedman, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry, Gil Zimmerman and J. Michael McGarry, III, Asst. U. S. Attys. were on the brief, for appellees.

Before FAHY, Senior Circuit Judge, and LEVENTHAL and ROBB, Circuit Judges.

LEVENTHAL, Circuit Judge:

This case is one of three related cases decided today which involve the procedural rights of tenants of housing, constructed under various provisions of the Federal housing legislation, prior to official approval of rent increases. In Thompson v. Washington, No. 71–2049, 162 U.S.App.D.C. ——, 497 F.2d 626, we hold that tenants of low-rent public housing are entitled not only to receive notice of proposed rent increases but also to participate in the process of official consideration of rent increases by making written presentations. In Marshall v. Lynn, No. 71–1786, 162 U.S. App.D.C. ——, 497 F.2d 643, we hold that such opportunities must also be afforded tenants of low- and moderate-income housing constructed, pursuant to § 221(d)(3) of the National Housing Act, with both FHA mortgage insurance and below-market-interest-rate loans. In the case at bar we hold that the opportunity to participate need not be accorded tenants of housing constructed under § 220 of the Housing Act as part of area redevelopment plans.

## I. INTRODUCTION

Plaintiffs are individual tenants and a tenants' association of Carrollsburg Square and Tiber Island apartment dwellers. These two apartment buildings, located in the Southwest Redevelopment Area of Washington, D. C., consist of upper-middle and upper-income units financed with loan guarantees by Federal Housing Administration (FHA is a division of the Department of Housing and Urban Development) under § 220 of the National Housing Act, 12 U.S.C. § 1715k (1970). In January and February of 1969, and in August 1970, the FHA approved rent increases in one or both of these two projects.

Plaintiffs claim that FHA's refusal to give them a hearing before acting upon

the rent increases was contrary to their statutory and constitutional rights. On cross-motions for summary judgment, the District Court awarded summary judgment to defendants. We affirm.

## II. STATEMENT OF THE FACTS

Southwest Washington is a 550-acre triangle of land located near the Capitol to the East, and the Potomac River (its southern and western boundary). Prior to its recent redevelopment, the area typified the blighted large cities; housing was often unsafe, unsanitary and insufficiently heated in the winter.[1] Congress concluded that to improve permanently the appearance of such areas, entire communities would have to be replanned.[2]

The development plan centered on enlisting the aid of private investors. It was contemplated that they would insist upon a high return and low equity requirements before committing private capital to redevelopment of slum areas.[3] Section 220 of the Housing Act of 1954 was to serve as the vehicle. Under the program envisioned, developers could acquire land in urban renewal areas, after it had been written down in cost by the local agencies,[4] mortgage loan terms would be available for 90% of the value of the construction subject to a $50,000,000 limit,[5] and the FHA would guarantee repayment of the loan. The guarantee, which insured in large part against the lender's risks, made money available at low enough rates of interest to support the required rate of return, given the predicted market rentals for the area.[6]

Pursuant to the provisions of § 220 and the urban renewal plan for Southwest Washington, the FHA determined in 1962 and 1963 to insure mortages granted by private lenders for the Tiber Island and Carrollsburg Square developments. Together they contain 811 rental units, most of which are in seven high-rise apartment buildings.

Before FHA insurance is granted to a project, rental schedules must be approved by the Commissioner.[7] The schedules consist of a maximum permissible rental ceiling and an initial rent schedule. Originally the FHA approved ceilings of $1,169,035 and $1,093,476, and initial rent schedules of $947,580 and $998,700, for Tiber Island and Carrollsburg Square respectively. These aggregate figures amounted to an average initial rental per unit of about $200 per month for the 811 units in the two combined projects, with a ceiling of approximately $230 per month.[8] Using a conventional assumption that families spend about 20% of their income on rent,[9] the income of the average family unit was envisioned as $13,800. In fact, incomes seem to be in a range from $12,000 to $45,000 per annum. In the case of family tenants, few have chil-

1. See Berman v. Parker, 348 U.S. 26, 30, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

2. Philip David, Urban Land Development 383–98 (1970).

3. Id. at 384.

4. 42 U.S.C. § 1453 (1970). See Q. Johnstone, The Federal Urban Renewal Program, 25 U.Chi.L.Rev. 301, 320 (1958).

5. Henry J. Aaron, Shelters and Subsidies: Who Benefits From Federal Housing Policies 178 (Appendix A) (1972); B. T. Fitzpatrick, FHA and FNMA Assistance for Multi-Family Housing, 32 Law & Contemporary Problems 439, 443 (1967).

6. See The Report of the President's Committee on Urban Housing, "A Decent Home" 55 (1968).

7. HUD Insured Project Servicing Handbook, RHM 4350.1 Supp. 1, Chapter 4, sec. 3.3 (as of September 1970).

8. The average monthly rent of all tenants of § 220 housing, per dwelling unit, was $238.-51 in 1968. Aaron, supra note 5 at 208 (Appendix B).

9. This is the figure used to derive income limits from the maximum rentals in Public Housing. See The Report of the President's Committee on Urban Housing, Technical Studies, V. 1, G. Von Furstenberg and H. Moskof, Federally Assisted Rental Housing Programs: Which Income Groups Have They Served or Whom Can They Be Expected to Serve 151 (1967).

dren living with them and usually both husband and wife work. Typically the tenants are professionals—lawyers, doctors, economists—and their work is connected with the Federal Government.

On February 3, 1969, FHA gave its required approval to increases bringing the rental schedules to $1,063,440 per year for Tiber Island and $1,085,580 per year for Carrollsburg Square. The Tenants' Council, believing this increase to be unjustified, requested an audit of the financial reports submitted in support of the increase and a meeting with FHA representatives to discuss the merits of the increase. Both requests were refused.

These events resulted in litigation in the District of Columbia Court of General Sessions between the project owners and numerous tenants who had placed the rental increase increment into escrow pending a determination of the legality of the increases, as well as the institution of the present action. These suits were dismissed. Thereafter, in December, 1969, a Settlement Agreement was entered into between the Tenants' Council and the owners. The tenants agreed not to seek restitution for alleged rental overcharges in excess of FHA maximums, in return for which they retained the funds in escrow and were protected against further increases until July 1970 or November 1970, depending on which of two options each tenant elected.

On August 26 and 27, 1970, FHA granted a second round of rental increases, which was allegedly accompanied by the setting of new methods for calculating maximum rental increases allowable under the required rent schedule. Tenants' Council again tried to obtain an audit or gain access to information justifying the rent increase; its requests were refused by the FHA. On September 30, 1970, the Tenants' Council and the project owners again entered into a settlement agreement temporarily

resolving their renewed dispute concerning rental levels, and only part of the increase approved by FHA was put into effect immediately for those tenants protected by the agreement. On this record the District Court granted summary judgment to the FHA officials. We affirm.

## III. THE CLAIM OF RIGHT TO A HEARING

In disposing of the case at hand we refer to the analysis in Thompson v. Washington, No. 71–2049, 162 U.S.App. D.C. ——, 497 F.2d 626 decided this day That opinion suffices to establish jurisdiction and standing. In *Thompson* we held that tenants of lower income public housing programs established under the United States Housing Act, 42 U.S.C. § 1401 et seq., have a right to contest rent increase proposals through written statements. In Marshall v. Lynn, No. 71–1786, also decided this day, we found a similar right to participate held by tenants of housing financed with FHA aid mortgage insurance at below market interest rates, pursuant to Section 221(d)(3) of the National Housing Act, 12 U.S.C. 1715*l* (1970). We based this procedural protection on our finding that tenants were intended beneficiaries of the rent limitation provisions of those housing programs.

The same analysis leads us to a different result for tenants in housing constructed under § 220 of the National Housing Act. Unlike the other housing programs, § 220 was not passed to benefit any specific class of tenants. Its purpose was to [10]

aid in the elimination of slums and blighted conditions and the prevention of the deterioration of residential property . . .

This was a remedial program to eliminate slum conditions, while the production of new housing for specific classes of needy persons was left to other programs.[11] It was a different, though

---

10. 12 U.S.C. § 1715k (1970).

11. Section 220 does provide for rehabilitation loans for properties in urban renewal areas,

complementary, program that was established under § 221(d)(3), combining FHA insurance with below-market-interest-rate loans to developers, to benefit low-and-middle-income [12] families displaced by § 220 urban renewal projects.[13] And public housing was also to serve the needs of low-income families.

█ This absence of purpose to benefit tenants accounts for the absence of any language in § 220 corresponding to the § 207 provision regarding "reasonable rentals." The omission was intentional. Although the Presidential Advisory Commission had proposed that such language be included in the statute,[14] this suggestion was not followed in the bills put forward for House and Senate consideration.[15] At the hearings the omission was called to the attention of the legislative committees,[16] but the "reasonable rentals" language was not inserted.

Section 220 did enable HUD to control rents through a provision that the Secretary

may in his discretion require such mortgagor to be regulated or restricted as to rents or sales, charges, capital structure, rate of return and methods of operation, and for such purpose the Secretary may make such contracts with . . . any such mortgagor as the Secretary may deem necessary to render effective such restriction or regulations.[17]

█ Pursuant to this authority, the Secretary promulgated a regulation providing that in reviewing a developer's quests for rent increase HUD will consider the economic soundness of the project and a reasonable return on the investment consistent with reasonable rentals to tenants. 24 C.F.R. 207.19(e). While the HUD regulations, are not entirely clear as to the objectives sought during review of rental increases,[18] it is our sense that taken as a whole they were not intended to establish a legally protected tenant interest in the setting of rents. The government's interest as a mortgagee in the eco-

---

which are generally run down, and may, therefore, benefit lower income groups. New housing had no such expressed beneficiary class.

12. It seems clear that Congress envisioned its housing legislation as middle income class oriented. *See* Housing Act of 1954, Hearings Before the U. S. Senate Committee on Banking and Currency, 83d Cong., 2d Sess. 558–61 (1954).

13. H.R.Rep.No.1429, 83d Cong., 2d Sess. 14 (1954).

14. A Report of the President's Advisory Committee on Government Housing Policies and Programs 7 (1953). The Committee stated:

The Committee agrees that unreasonable rent increases ought not to follow rehabilitation. The Section 220 proposal contemplates the establishment of maximum rents for structures of 12 or more units. This control would follow the same procedures now used by the Federal Housing Administration in its large-scale rental housing program.

15. *See* H.R. 7839, 83d Cong., 2d Sess. (1954), as reprinted in Housing Act of 1954, Hearing Before the U.S. House Committee

on Banking and Currency, 83d Cong., 2d Sess. 5 (1954); S. 2938, 83d Cong., 2d Sess. (1954), as reprinted in Senate Hearings, *supra* note 12, at 652.

16. Statement of James G. Thimmes, Vice-President, CIO, and United Steelworkers of America, Senate Hearings, *supra*, note 12, at 497–98. He stated: "We do not find in the proposed legislation the recommendation made by the Advisory Committee that there be some form of rent supervision on rental projects built or rehabilitated with governmental aids, no matter what the size of the project."

17. 12 U.S.C. § 1715k(d)(2)(A).

18. Appellants stress that the Secretary's regulations for § 220 housing simply incorporate the FHA regulations under § 207, as to the requirement of "reasonable rentals to tenants." 24 C.F.R. § 207.19(e). This was done by reference, 24 C.F.R. § 220.511. The fact that HUD did not take occasion to refine in its regulations the differing objectives of rent control does not alter the substantial differences in character and interest of tenants in § 220 housing and those in other housing projects.

nomic soundness of the project accounts for a concern that rentals be "reasonable." This concern would not necessarily coincide with that of the mortgagor. The government may have attitudes toward risk, and preferences for distribution of profits over time, different from those of a project developer. Moreover, the government will be concerned with external effects of a developer's management decisions on the character of property not owned by the developer but within the total area upgraded through the government's efforts. A developer might, for example, regard high rents with the likelihood of a high turnover rate or a substantial vacancy rate as offering the best opportunity to maximize his profits. But turnover and vacancies may affect the appearance of the larger residential community and the quality of neighborhood life in general—effects to which the government involved in the entire upgraded area may be more sensitive than a single landlord.[19]

The government's interest in reviewing the mortgagor's rent-setting decisions may on occasion coincide with the desires of particular tenants to moderate rents, and the Secretary's use of the power to review rent increase proposals may also promote tenants' welfare. Nevertheless, the interests of tenants and that of the government are analytically distinct. It is our view, on this record, that neither Congress nor the Secretary intended to establish a program of rent control for the purpose of protecting resident tenants.[20] Whatever protection tenants in fact derive from the process of review they receive as incidental beneficiaries, and this interest is insufficient to support a claim of right to be heard either under the statute or under the due process clause.[21]

Affirmed.

FAHY, Senior Circuit Judge, dissenting:

The basic requirement that the rentals in the development projects involved

19. The Government's brief acknowledges that the restrictions on rents are intended, in part, "as a brake on [investors] to safeguard against exorbitant returns" (p. 9) and "as a barrier to possible runaway revenues" (p. 11). We take this as an objective to be served concomitantly with, rather than independently of, the Government's interest as a prudent mortgagee.

We are not confronted with an investor contending that the Government is unreasonably curtailing his return and subsidizing his high-income tenants with a rental restriction that bears no possible relation to protection of the mortgage interest. Presumably, the investor in a project so situated as to permit soaring economic rentals could obtain a private mortgage that would replace the government mortgage and its accompanying restraints.

20. Plaintiffs have argued that "abuse" under prior housing statutes, examined by the Senate Committee during hearings on § 220, led Congress to provide authority to fix rents. The abuses found, however, were unrelated to rent charges. What concerned the Congress was the so-called practice of "mortgaging-out" by which developers reaped windfall profits on the receipt of the mortgages, by building for less than the mortgag-

ing amounts. See Senate Hearings, *supra* note 12, at 1375-76. The language of discretionary rental restrictions was in the bill as introduced by the House, before the "mortgaging-out" problem emerged at the hearings, and the solution of cost-certification prior to mortgage approval was later provided by regulations. 24 C.F.R. § 220.-618 (1972).

21. "HUD is always prepared to consider timely objections or contentions and supporting documentation submitted to HUD, concerning any matter (including such rent-increase-matters) under HUD consideration." This is quoted in the Government's brief (p. 13) as part of a letter from the United States Attorney to appellants' counsel, dated 16 March 1973. The brief states: "While this letter is not a part of the record, it is obviously a document with which appellants are familiar, and reference to it falls within the teaching of United States v. Kearney, 136 U.S.App.D.C. 328, 331 n.4, 420 F.2d 170, 173 n.4 (1969)." Apart from permissibility of judicial consideration under *Kearney* it is so obviously part of the duty of HUD officials, under any elementary view of their functions, as to warrant judicial notice under the presumption of regularity.

shall be reasonable stems from section 207(b)(2) of the National Housing Act. The court accordingly holds in a companion case, Marshall v. Lynn, No. 71–1786, 162 U.S.App.D.C. ——, 497 F.2d 643, that the tenants in projects developed under section 221 of the Act, providing for low or moderate income housing, shall be afforded an opportunity through written statements to contest proposals for rental increases. Yet the court denies this opportunity to tenants in projects developed under section 220 of the Act, which have the purpose of rehabilitating blighted areas. The rentals in those projects are also required to be reasonable, and I find no legal basis for depriving their tenants of the same opportunity accorded tenants in projects developed under section 221. In both situations the reasonable standard of section 207(b)(2) is carried forward by regulations or agreed arrangements between the Administrator and the developer. The regulations or arrangements, as the case may be, are established under the authority granted to the Administrator, by section 220(d)(2) in a section 220 project, and by section 221(d)(3) in a section 221 project.

The distinction between the two situations drawn by the court, based on the difference in the purposes of the two types of projects, I think is not justified. In each instance the reasonable standard applies. What is reasonable in one case may be quite different from what is reasonable in the other, depending upon a number of factors, among them the ability to pay, but these different considerations must be judged, in their own settings, by the same prescribed standard of reasonableness. Therefore, as it seems to me, no legal distinction should be drawn which denies to one the opportunity granted to the other. Both are entitled to reasonable treatment with respect to their respective rentals.

While there is the need for assuring a fair return to the developer on his investment, it is not inconsistent with this need to permit tenants facing rental increases a limited amount of participation in the determination of their reasonableness. Even were the standard of reasonableness to be judged principally from the viewpoint of the need of the investor, those who pay rent should also be heard in some fashion by the public authorities. And those in more comfortable circumstances than others should not because of that be denied an opportunity to contest the reasonableness of their own rentals.