### GRAMERCY SPIRE TENANTS' ASSOCIATION, Plaintiff,

v.

**Patricia Roberts HARRIS, as Secretary of the Department of Housing and Urban Development, the Department of Housing & Urban Development, and Morris Sosnow, Jerrold A. Lieberman, Leonard Schwartz, Individually and as co-partners in 16th Street Associates, Defendants,**

and

**Patricia Grant, James N. Palik, Rosalyn Rusalem, the Conciliation and Appeals Board and the Housing and Development Administration of the City of New York, Additional Defendants on Counterclaim.**

No. 76 Civ. 4028 (WCC).

United States District Court, S. D. New York.

Sept. 16, 1977.

Maurice A. Reichman, New York City, for plaintiff, and James N. Palik and Rosalyn Rusalem, additional defendants on counterclaim.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendant Patricia R. Harris; Patrick H. Barth, Asst. U. S. Atty., Barrie L. Goldstein, Atty., Dept. of Justice, New York City, of counsel.

Squadron, Ellenoff, Plesent & Lehrer, New York City, for defendants, Morris Sosnow, Jerrold A. Lieberman and Leonard Schwartz, co-partners doing business as 16th Street Associates; Neal M. Goldman, New York City, of counsel.

Julia P. Heit, New York City, for Patricia Grant, additional defendant on counterclaim.

W. Bernard Richland, Corp. Counsel, New York City, for Housing and Development Administration of the City of New York; Neil S. Lovit, New York City, of counsel.

## MEMORANDUM AND ORDER

CONNER, District Judge:

Plaintiff Gramercy Spire Tenants' Association has brought suit to challenge the federal government's preemption of New York City's rent control laws as they apply to the Gramercy Spire Apartments located at 160 Third Avenue in New York City. The complaint names as defendants the Department of Housing and Urban Development and its Secretary, Patricia Roberts Harris[1] ("HUD") and the individual copartners of "16th Street Associates" ("Associates"), the owner of Gramercy Spire Apartments. In its answer, Associates has counter-claimed for a declaration of the validity of the preemption and for injunctive relief.[2] Before us now is its motion for summary judgment on the counterclaim.

Associates' position, in brief, is that the HUD regulation, 24 C.F.R. §§ 403.1–403.6,[3] which authorized the preemption was validly promulgated, and that HUD's determination, pursuant thereto, that its economic interest was jeopardized in respect to the Gramercy Spire project—necessitating preemption—is unreviewable agency action. Plaintiff contends, to the contrary, that the regulation is invalid; that the basis for HUD's determination of economic jeopardy is reviewable in this Court; that there are genuine issues of fact pertaining to the latter issue; and that, in any event, in being denied an opportunity to be heard prior to HUD's preemption decision, the tenants of Gramercy Spire were deprived of their right to procedural due process guaranteed by the Fifth Amendment. On the latter claim plaintiff, together with the Housing and Development Administration, joined as a defendant on Associates' counterclaim, has cross-moved for summary judgment.

### I.

The facts which will be relevant to the Court's disposition of the motion are undis-

---

1. Carla Hills was the Secretary of HUD at the time the complaint was filed and was originally named as defendant. Patricia Roberts Harris is her successor in office and is substituted as a defendant pursuant to Rule 25(d)(1), F.R.Civ.P.

2. In addition to plaintiff, Associates named the following as "parties to the counterclaim": Patricia Grant, James N. Palik and Rosalyn Rusalem, tenants in Gramercy Spire Apartments; the Conciliation and Appeals Board ("CAB"), charged with administering the local rent control laws pertinent to this case; and the Housing and Development Administration ("HDA") of the City of New York, charged with enforcement of those laws.

3. 24 C.F.R. § 403.1 et seq., the local rent control regulation, was adopted on October 22, 1975. 40 Fed.Reg. 49320. Sections 403.1–403.6 are those relevant to the present case and comprise the "general provisions" of the regulation and the provisions relating to "unsubsidized insured projects."

puted. Gramercy Spire is a privately owned and financed apartment building (with 146 rentable dwelling units), whose mortgage note in the amount of $2,588,100 is insured by the Secretary of HUD under § 207 of the National Housing Act ("NHA"), *as amended,* 12 U.S.C. § 1713. The insurance of mortgages under § 207 is designed as an incentive to private lenders to make funds available for the construction of family housing accommodations at reasonable rentals. The § 207 program represents the federal government's "basic" commitment to unsubsidized housing. Affidavit of Fred W. Pfaender, Director of HUD Office of Loan Management ("Pfaender Affidavit") at 1; 12 U.S.C. § 1713(b)(2); *515 Associates v. City of Newark,* 424 F.Supp. 984, 988 (D.N.J.1977). During the term that the Secretary is the insurer or the holder of the mortgage, HUD exercises considerable supervision over the mortgagor, the precise nature of which is set forth in the regulations promulgated by the Secretary at 24 C.F.R. § 207.1 *et seq.* HUD, *inter alia,* maintains close scrutiny over the financial records and business operations of the mortgagor, as well as over the general maintenance of the property and the level of rent which is charged. 24 C.F.R. § 207.-19(e), (f). In respect to the latter, the regulations provide that

"No charge shall be made by the mortgagor for the accommodations, facilities or services offered by the project in excess of those approved by the Commissioner in writing prior to the opening of the project for rental. In approving such charges and in passing upon applications for changes, consideration will be given to the following and similar factors:

(1) Rental income necessary to maintain the economic soundness of the project.

(2) Rental income necessary to provide reasonable return on the investment con-

sistent with providing reasonable rentals to tenants." 24 C.F.R. § 207.19(e).

The obligations which the mortgagor assumes in accepting the benefits of § 207 mortgage insurance, and the restrictions to which he becomes subject, are embodied in a "regulatory agreement," as provided for in 24 C.F.R. § 207.18(c) (Exhibit A annexed to Associates' motion).

In the present case, Associates availed itself of the § 207 program and became a party to a regulatory agreement with the Federal Housing Commissioner [4] in August of 1962. At that time, since it was of post-1947 construction, Gramercy Spire Apartments was subject to neither New York State nor New York City rent control laws. See N.Y.C.Admin.Code § Y51-3.-0(e)(2)(h); [5] *8200 Realty Corporation v. Lindsay,* 27 N.Y.2d 124, 313 N.Y.S.2d 733, 261 N.E.2d 647 (1970). The building came under the umbrella of local rent regulation only upon the passage by New York City of the Rent Stabilization Law ("RSL") of 1969, N.Y.C.Admin.Code §§ YY51–1.0 to YY51–7.0,[6] which undertook to provide rent regulation for housing accommodations completed between February 1, 1947 and March 10, 1969. N.Y.C.Admin.Code § YY51–3.0(a); *8200 Realty Corporation v. Lindsay, supra,* 27 N.Y.2d at 129, 313 N.Y.S.2d at 736, 261 N.E.2d at 649. The administration of the 1969 law was confided largely in a Real Estate Industry Stabilization Association ("Stabilization Association"), N.Y.C.Admin. Code § YY51–6.0, of which Associates became a member. Also at this time, Associates added to all Gramercy Spire leases a "pass-through" rider providing, in effect, that if HUD approved rentals greater than those permissible under the RSL, tenants would pay the federally approved rentals immediately (Exhibit B annexed to Associates' motion).

The category of dwelling units afforded protection under the RSL, however, was significantly restricted by the passage of

---

**4.** The "functions, powers and duties" of the Federal Housing Administration and its officers were transferred to the Secretary of HUD in the Department of Housing and Urban Development Act of 1965, 42 U.S.C. § 3534(a).

**5.** The cited provision is part of the New York City Rent and Rehabilitation Law, which is reprinted in McK.Unconsol.Laws, Book 65 at 371 ff.

**6.** The RSL is reprinted in McK.Unconsol.Laws, Book 65 at 587 ff.

State legislation in 1971. Under the Vacancy Decontrol Law, 1971 Laws of N.Y., Ch. 371, all rent-controlled or rent-stabilized apartments which became vacant on or after July 1, 1971, were to be rented on a free-market basis. See *Perth Realty Company v. Dovoll*, 358 N.Y.S.2d 619, 622 (Civil Ct.N.Y.Cty.1974). In 1974, however, pursuant to the Emergency Tenant Protection Act ("ETPA") and related legislation, 1974 Laws of New York, Ch. 576, New York State ended vacancy decontrol and considerably broadened the scope of potential local rent regulation. The ETPA was a form of local option legislation, which authorized the City of New York (and other specified localities) to declare the existence of a public emergency requiring the regulation of residential rents. The Act provided that upon the declaration of an emergency, all apartments which had theretofore been destabilized or exempt from rent stabilization—including apartments which had become vacant on or after July 1, 1971—were to be subject to the RSL. 1974 Laws of New York, Ch. 576 §§ 2, 4. Effective July 1, 1974, the New York City Council implemented the legislation, determining the existence of a public emergency for all classes of housing accommodations in New York City subject to control by the ETPA. N.Y.C. Council Resolution 276. See *Axelrod v. Starr*, 52 A.D.2d 232, 383 N.Y.S.2d 31, 33 (App.Div. 1st Dept. 1976); *Perth Realty Company v. Dovoll, supra*. The consequence, for purposes of the present case, is that Gramercy Spire apartments became fully subject to the provisions of the RSL. As Associates acknowledges, until the local rent control laws were preempted by HUD in respect to Gramercy Spire Apartments on April 6, 1976, Associates assumed that it was legally bound to comply with—and did comply with—both the RSL and ETPA (Associates' Answer at 3, ¶ 10; Exhibit G annexed to Associates' motion).

Under the RSL, a "level of fair rent increase" is established annually by the Rent Guidelines Board "as a guideline for rent increases upon renewal of leases or any new tenancy * * *" N.Y.C.Admin.Code § YY51–5.0. Provision is made, as well, for landlords to apply for "hardship" increases in the level of stabilization rents. N.Y.C. Admin.Code § YY51–6.0(b)(3); § 43 of the Rent Stabilization Code ("RSC").[7] Application is made by the landlord to the Conciliation and Appeals Board ("CAB") of the Stabilization Association. Associates filed such an application with respect to the Gramercy Spire Apartments on November 4, 1974 (Exhibit C annexed to Associates' motion). Under the hardship formula as set forth in § 43, Associates requested a 12.27 percent increase in gross monthly rental income (from $47,932.09 to $53,815.09). Upon request, it supplied the CAB with additional financial data on April 11, 1975. Associates was later informed, on November 3, 1975, of CAB's intention to process its hardship application in accordance with State legislation effective July 2, 1975, providing for the use of a new formula (the "3 plus 3" formula) in the determination of comparative hardship. According to Associates, "the effect of the new formula would have been a substantially smaller increase than that for which [it had] applied" (Associates' motion at 6). On December 2, 1975, Associates agreed to have its application processed in accordance with the new formula. As of the date of this opinion, however, Associates has not, to the Court's knowledge, received a decision on its application.[8]

During the time that its hardship request was pending with CAB, Associates submitted a proposed schedule of rents to HUD, which received HUD approval on March 18, 1975. The schedule provided for a gross monthly rental income of $58,692.00. In a letter dated September 9, 1975, Associates demanded CAB's approval of the

---

7. The RSC is reprinted in McK.Unconsol.Laws, Book 65 at 601 ff.

8. CAB is apparently awaiting a judicial determination of whether the legislation introducing the "3 plus 3" formula may be applied to hardship applications—like Associates'—which were pending as of its effective date (Affidavit of Ellis S. Franke, Executive Director and General Counsel of CAB, filed April 7, 1977).

schedule, citing the "interim" local rent control regulation, 40 Fed.Reg. 8189 (predecessor to 24 C.F.R. § 403.1 *et seq.*) which HUD had published on February 26, 1975. No approval from CAB was forthcoming.

As 1975 drew to a close, Associates discussed with HUD the possibility of preemption and submitted data on its financial position, including a summary of its income and expenses for the fiscal period July 1, 1974 through June 30, 1975, copies of its rent roll and other "interpretive material" (Associates' motion at 7; Exhibits M–1 and M–2).

On January 16, 1976, mortgagee Lincoln Savings Bank advised Associates that its mortgage was in default for failure to remit amortization and "replacement reserve" funds totalling approximately $11,000 (Exhibit K–1). A half-month later, however, upon HUD's agreement to suspend deposits to the Replacement Reserve fund, the Bank granted Associates a deferment of amortization through May 1, 1976 (Exhibit K–2). For the period during which amortization was deferred, Associates, in compliance with HUD requirements, filed reports of total receipts and disbursements for the months November 1975 through April 1976 (Exhibits L–1 to L–6). `

On April 6, 1976, HUD issued a formal letter of preemption, in which it asserted "exclusive jurisdiction" over the regulation of rents at Gramercy Spire Apartments. It authorized Associates, 30 days after approval of a rent implementation schedule, to collect rents totalling $57,823.00 per month for 146 dwelling units. In his affidavit filed with the Court, the Director of the HUD Office of Loan Management, and author of the April 6 preemption letter, Fred W. Pfaender, stated that the $57,823.00 figure constituted the "minimum rental that [would be] sufficient to meet operating costs and debt service. [It does] not provide for sufficient income to give the owner a return on his investment or to give the owner income which can be escrowed for reserve for replacements."

In accordance with the terms of the April 6 order, Associates prepared a rent implementation schedule (Exhibit IV annexed to Complaint), which was approved by the HUD New York Area Office on May 6, 1976. The schedule provided for a "total gross proposed jeopardy rent roll" of $57,534.83 on a monthly basis. Percentage increases per apartment ranged from 0 to 20 percent. Nearly 50 percent of the tenants were slated to receive a 20 percent increase, and approximately 92 percent were slated to receive increases in excess of 6 percent (the maximum percentage increase collectible by a landlord in any one year pursuant to a "hardship" increase under the RSL. See RSC § 43).

The tenants of Gramercy Spire were not placed on notice of the increased rentals until May 19, 1976 and were then informed that the new rents would become effective as of July 1, 1976 (Exhibit III annexed to Complaint; Associates' motion at 8.)

It is the Court's understanding that, pending the instant litigation, all HUD-ordered rent increases are being paid by the tenants in escrow to Associates' attorney (Plaintiff's 9(g) Statement; Plaintiff's Memorandum of Law at 5; Associates' Reply Memorandum of Law at 11–12).

II.

The Court has jurisdiction over the action, with respect to the claims asserted against HUD, under 28 U.S.C. § 1361, see *Mattern v. Weinberger*, 519 F.2d 150, 155–57 (3d Cir. 1975), *vacated on other grounds*, 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976), *on remand*, 427 F.Supp. 1318 (E.D.Penn.1977); *Frost v. Weinberger*, 515 F.2d 57, 62 (2d Cir. 1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976); *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 300 (2d Cir. 1971); *Davis v. U. S. Dept. of HUD*, 416 F.Supp. 448, 451 (S.D.N.Y.1976), and 28 U.S.C. § 1337, see *Davis v. Romney*, 490 F.2d 1360, 1365–66 (3d Cir. 1974); *Ellis v. U. S. Dept. of Hsg. & Urban Develop.*, 551 F.2d 13, 16 (3d Cir.

1977).[9] With those jurisdictional predicates, Associates was properly joined as a defendant under Rule 19(a), F.R.Civ.P., *Langevin v. Chenango Court, Inc., supra.* The Court need not consider the additional bases of jurisdiction alleged.[10]

Two primary questions are presented on the parties' cross-motions for summary judgment: first, whether HUD's promulgation of the local rent control regulation, 24 C.F.R. §§ 403.1–403.6, constituted a valid exercise of agency power; and, second, as stressed by the tenants and the Housing and Development Administration in their papers opposing Associates' motion, whether HUD's decision to preempt the New York rent control laws violated procedural due process in the absence of prior notice to the tenants and an opportunity for them to be heard. The parties have raised other issues as well, namely, whether the facts underlying HUD's preemption decision are subject to judicial review, and, assuming that they are, whether plaintiff has identified disputed issues of material fact pertaining to the appropriateness of the preemption in this case, which themselves would bar the granting of defendant's motion. These latter questions may be unnecessary to decide, however, since, if tenant participation in the decision-making process is constitutionally mandated, the case would have to be returned to the agency for further proceedings. The Court turns, therefore, to a consideration of the validity of the local rent control regulation and the constitutionality of the procedures which HUD employed in rendering its preemption decision.

24 C.F.R. §§ 403.4–403.6 govern unsubsidized projects with mortgages insured or held by HUD. § 403.5 states the Department's policy not to interfere with regulation by a local rent control board unless it determines that "the delay or decision of a board, or other authority regulating rents pursuant to state or local law, jeopardizes the Department's economic interest in the project." In that event, the Department will exercise its preemptive authority. The economic jeopardy envisioned in the regulation is, of course, the danger of the owner's default on its HUD-insured mortgage. HUD determined, in adopting the regulation, that local rent control ordinances, while not the sole factor, are a "significant factor" in causing such defaults. 40 Fed. Reg. 49319. The Court has no hesitation in finding that the regulation is consistent with the underlying statutory authority granted the Secretary in the National Housing Act of 1934, 12 U.S.C. §§ 1701 *et seq.*, and the Department of Housing and Urban Development Act of 1965, see 42 U.S.C. §§ 3531, 3532, 3535, and, accordingly, is a legitimate exercise of the agency's power. See *New York Foreign Freight Forwarders and Brokers Ass'n v. Federal Maritime Commission,* 337 F.2d 289, 295 (2d Cir. 1964), *cert. denied,* 380 U.S. 910, 914, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965).

Among the responsibilities of the Secretary in administering the nation's housing programs is to "encourage private enterprise to serve as large a part of the Nation's total housing and urban development needs as it can * * *." 42 U.S.C. § 3532(b). Mortgage insurance serves this end, while simultaneously creating a degree of economic risk on the part of HUD as insurer. In the event of the mortgagor's default, the Secretary must draw upon the reserves of the General Insurance Fund, established under § 519 of the NHA, 12 U.S.C. § 1735c, in order to meet HUD's obligation to the mortgagee. 12 U.S.C. § 1713(g). Default thus threatens the solvency of the Fund. See *Carr Central Neighborhood v. U. S. Dept. of HUD,* 424 F.Supp. 1194, 1197 (E.D. Mo.1976). Moreover, if there is inadequate cash available to meet the mortgagee's claim, the Secretary may have to negotiate a loan from the United States Treasury, to

---

9. Plaintiff clearly has the requisite "associational standing" to bring suit in this case. See *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

10. 28 U.S.C. §§ 1346(a)(2), 2201 and 2202.

be repaid with interest. 12 U.S.C. § 1735d. See 1965 U.S.Code Cong. and Admin.News at 2637–38, 2698–99. Finally, default may necessitate HUD's own management of the mortgaged property, on at least a temporary basis. 12 U.S.C. § 1713(k), (*l*).

■ In the Mortgage Insurance subchapter of the NHA, the Secretary is thus directed to refuse any project for insurance unless found to be "economically sound." 12 U.S.C. § 1713(c)(3). And during the life of the project, the Secretary is invested with broad regulatory power over rents and the other incidents of real estate ownership. Specifically, the Secretary is authorized to "[regulate]" or "[restrict]" the mortgagor with respect to "rents or sales, charges, capital structure, rate of return, and methods of operation to such extent and in such manner as to provide reasonable rentals to tenants and a reasonable return on the investment." 12 U.S.C. § 1713(b)(2). Finally, the Secretary "is authorized and directed to make such rules and regulations as may be necessary to carry out the provisions of this subchapter." 12 U.S.C. § 1715b. In view of its own economic stake in § 207 mortgage insurance programs and its responsibility to maximize the role of private enterprise in the nation's housing, HUD has a "pressing interest" in the continuing solvency of its mortgagors. *Hahn v. Gottlieb,* 430 F.2d 1243, 1247 n. 5 (1st Cir. 1970). See also *Levin-Sagner-Orange v. Rent Level Bd.,* 142 N.J.Super. 429, 361 A.2d 616, 619 (1976). Prior to the adoption of the rent control regulation in its final form, the evidence available to HUD suggested that local rent control ordinances threatened, on occasion, seriously to undermine that interest. HUD was informed that annual increase percentages under local rent control regulations often "bore no relationship to the actual costs incurred by a mortgagor in operating and maintaining a residential rental property," and, further, that applications for hardship increases by mortgagors often involved them in cumbersome and time-consuming procedures, with the result that even if an increase was approved, "it was often too late to prevent the project from going into default." 40 Fed.Reg. 49319. Although

plaintiff observes, correctly, that Congress included no express delegation of preemptive authority in the NHA, it did invest the Secretary with broad rulemaking power and with specific authorization to regulate rentals in § 207 projects. Bearing in mind the purposes and concerns underlying the Act, to which the Court has adverted, there can be no question of the legitimacy of HUD's decision to preempt local rent control laws on a case-by-case basis, premised upon a finding of economic jeopardy. Notably, several other courts have reached the identical conclusion. *Argo v. Hills,* 425 F.Supp. 151, 154–55 (E.D.N.Y.1977); *515 Associates v. City of Newark,* 424 F.Supp. 984, 991–92 (D.N.J.1977); *City of Boston v. Hills,* 420 F.Supp. 1291, 1298 (D.Mass.1976); *Levin-Sagner-Orange v. Rent Level Bd.,* supra, 142 N.J.Super. at 434, 435, 361 A.2d at 619. See *Edgemere at Somerset v. Johnson,* 143 N.Y.Super. 222, 362 A.2d 1250 (Dist.Ct. Somerset Cty.N.J.1976).

■ The regulation, validly issued, has the force and effect of federal law, *Free v. Bland,* 369 U.S. 663, 668, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 151–52, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); *515 Associates v. City of Newark, supra* at 992; moreover, it is clear that its application results in a direct conflict with local rent control ordinances. HUD has stated that its purpose in processing a request for rental increases under the regulation is "to determine the *minimum* rents necessary to assure payment of debt service, return on investment * * * and operating expenses." 40 Fed. Reg. 49319 (emphasis added). Indeed, in the present case, HUD's Office of Loan Management has indicated that the allowable increase is calculated under an even more stringent standard, in that "return on investment" is excluded from the minimum income equation. Thus the monthly rental income HUD authorizes is intended to be the minimum necessary to meet operating costs and debt service. HUD issues a certification of preemption only if the delay or decision of the local rent control board stands as a barrier to the collection of that

minimum. Under these circumstances, it is obvious that compliance with the local rent control laws would spell non-compliance with the federal law; accordingly, under the Supremacy Clause of the United States Constitution, Article VI, Clause 2, the local rent control laws must give way.[11] *Jones v. Rath Packing Co.,* 430 U.S. 519, 525–526, 97 S.Ct. 1305, 51 L.Ed.2d 604 (March 29, 1977); *DeCanas v. Bica,* 424 U.S. 351, 357 n. 5, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976); *Free v. Bland, supra.* See *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1962); *Argo v. Hills, supra,* at 155; *515 Associates v. City of Newark, supra* at 992 n. 13.[12]

While HUD thus has the power to preempt, the question remains whether it is required to grant the tenants a voice in the preemption proceeding. As written, the regulation provides no opportunity for tenant participation. Both the Gramercy Spire tenants and the Housing and Development Administration, the latter represented by the Corporation Counsel of the City of New York, contend that the federal government's abrogation of the tenants' rights in the Rent Stabilization Law and the Emergency Tenant Protection Act, without prior notice or opportunity to be heard, deprived them of their property in violation of the due process clause of the Fifth Amendment.[13] Procedural due process protection has, of course, long been held applicable by the Supreme Court to administrative determinations affecting individual interests in property. *Londoner v. Denver,* 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908). See *United States v. Florida East Coast R. Co.,* 410 U.S. 224, 244–45, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973); *Alaska Airlines v. C. A. B.,* 178 U.S.App.D.C. 116, 545 F.2d 194 (1976). A separate line of cases, beginning with *Board of Regents v. Roth,* 408 U.S.

564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), has provided a definitional framework for the determination of which interests qualify as "property" interests warranting that protection. See also *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Essentially, the later cases reaffirm the standard set forth in *Roth,* that

> "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance, that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."

As *Roth* and subsequent cases make clear, the potential sources in state and federal law of protected property interests are varied and numerous, for example, formal con-

---

11. The Court has considered Grant's Tenth Amendment argument and rejects it.

12. The Court is in agreement with Associates that, assuming a valid preemption, the local rent control laws could not affect the validity of "pass-through" provisions in tenants' leases allowing the immediate implementation of a

HUD-ordered rent increase. See *Argo v. Hills,* 425 F.Supp. 151, 155 (E.D.N.Y.1977).

13. The guarantees of procedural due process are applicable in the Fifth as well as the Fourteenth Amendment context. See *Arnett v. Kennedy,* 416 U.S. 134, 164, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring).

tracts,[14] implied agreements stemming from the policies and practices of institutional employers,[15] state and federal statutes [16] and regulations [17] and municipal ordinances.[18] There is a similarly broad range of "protected interests," for example, in public education [19] and employment,[20] welfare benefits,[21] and occupancy of public or quasi-public housing.[22]

The subject of a claimed entitlement to "low-rental" housing has arisen twice in the Second Circuit since *Roth*, in *Burr v. New Rochelle Municipal Housing Authority*, 479 F.2d 1165 (1973), and *Grace Towers Ten. Ass'n v. Grace Hous. Dev. Fund Co.*, 538 F.2d 491 (1976). In *Burr*, a legitimate claim of entitlement to low-cost housing was unmistakably derivable from state statute. The plaintiffs were tenants in apartments "controlled and operated by the * * * New Rochelle Municipal Housing Authority, a public corporation organized under New York State law, *to provide low rent housing for persons of low income*" (emphasis added). The tenants challenged the Authority's imposition of an across-the-board rent increase in the absence of an opportunity for them to be heard. The Court held that the tenants were entitled to limited procedural safeguards under the due process clause, in the form of advance notice of the proposed rent increase, the opportunity to file written objections and relevant opposing material and a statement of reasons underlying the Authority's decision.

The Court held against the tenants in *Grace Towers*, however, on the ground that they lacked a legitimate claim of entitlement upon which due-process protections could attach. The tenants there resided in a project insured and subsidized under § 221(d)(3) of the NHA, 12 U.S.C. § 1715*l* (d)(3). Pursuant to its regulatory agreement, the owner filed an application with HUD for a rental increase which ultimately received the agency's approval. The HUD regulation in force at the time, however, made no provision for "tenant participation in the agency's decision on a rental increase application." In holding that the tenants were not entitled to protection under the due process clause, the Court focused upon the purpose underlying the § 221(d)(3) program and the specific provision therein respecting rent regulation—the program, the Court said, was intended to promote the construction of housing by private enterprise, and, moreover, explicitly left decisions as to rent increases to the "experienced discretion of the Secretary." Under these circumstances, the tenants "could not reasonably expect that they were to be forever immunized from rent increases; nor could they legitimately expect an opportunity to participate in [the] decision-making process * * *." 538 F.2d at 494.

Notably, *Grace Towers* is only one of a number of cases which have rejected a claimed property interest in low-rental housing on the part of tenants residing in projects insured, or insured *and* subsidized

---

**14.** See *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

**15.** See, *e. g., Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**16.** See, *e. g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

**17.** See, *e. g., Klein v. Mathews*, 430 F.Supp. 1005 (D.N.J.1977).

**18.** See *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

**19.** See, *e. g., Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

**20.** See, *e. g., Board of Regents v. Roth*, 408 U.S. 564, 576–77, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Buck v. Board of Ed. of City of New York*, 553 F.2d 315 (2d Cir. 1977).

**21.** *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). See *Board of Regents v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**22.** See, *e. g., Caramico v. Secretary of the Department of HUD*, 509 F.2d 694 (2d Cir. 1974); *Lopez v. Henry Phipps Plaza South, Inc.*, 498 F.2d 937 (2d Cir. 1974); *Joy v. Daniels*, 479 F.2d 1236 (4th Cir. 1973).

under various sections of the NHA. See also *Ellis v. U. S. Dept. of HUD*, 551 F.2d 13 (3d Cir. 1977) (§ 220, 12 U.S.C. § 1715k); *Harlib v. Lynn*, 511 F.2d 51 (7th Cir. 1975) (§ 221(d)(3)); *Paulsen v. Coachlight Apartments Co.*, 507 F.2d 401 (6th Cir. 1974) (§ 236, 12 U.S.C. § 1715z–1); *Tenants' Coun. of Tiber Island-Carrollsburg Sq. v. Lynn*, 162 U.S.App.D.C. 61, 497 F.2d 648 (1973), *cert. denied*, 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974) (§·220); *People's Rights Organization v. Bethlehem Associates*, 487 F.2d 1395 (3d Cir. 1973), *summarily aff'g*, 356 F.Supp. 407 (E.D.Pa.1973) (§ 236); *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir. 1970) (§ 221(d)(3)); *Medlin v. Fickling & Walker Development Co., Inc.*, 420 F.Supp. 811 (N.D.Ga.1976) (§ 236). See *Langevin v. Chenango Court, Inc.*, 447 F.2d 296 (2d Cir. 1971) (rejecting due-process claim of § 221(d)(3) tenants prior to Supreme Court's decision in *Roth*). But see, *Marshall v. Lynn*, 162 U.S.App.D.C. 56, 497 F.2d 643 (1973), *cert. denied*, 419 U.S. 970, 95 S.Ct. 235, 42 L.Ed.2d 186 (1974) (holding § 221(d)(3) tenants entitled, on statutory grounds, to limited procedural safeguards prior to rental increase). *Contra, Geneva Towers Tenants Org. v. Federated Mortgage Inv.*, 504 F.2d 483 (9th Cir. 1974) (§ 221(d)(3)). As viewed by a majority of the cited cases, the primary objective of the Act was not to bestow upon tenants the benefit of a system of low-rent control; rather, it was to generate the construction of low- and middle-income housing by private industry through a system of financial inducements to the private sector and the continuing assurance of an economically sound investment. That the achievement of that objective would require considerable administrative flexibility was acknowledged by Congress by leaving the matter of rent control to a "regulatory agreement" between the Secretary and the mortgagor, or, in the words of *Grace Towers*, to the "experienced discretion of the Secretary." See *Geneva Towers, supra*, at 493 (Hufstedler, J., dissenting); *Langevin, supra*, at 301; *Hahn, supra*, at 1246, 1247; *Medlin, supra*, at 813, 814. In the view of Judge Hufstedler, dissenting in *Geneva Towers*, individual tenants were necessarily subject to being sacrificed under the statutory scheme for the benefit of "the class of low and middle income housing consumers" as a whole. 504 F.2d at 497–498.

In short, *Grace Towers* and its kindred cases under the NHA present instances in which the courts—or a majority of them—have been unable to discern an overriding statutory objective to provide the benefit of fixed or low rental housing to tenants. Although, superficially, *Grace Towers* resembles the present case in that the tenants in both instances were subject to HUD-ordered rent increases, the cases diverge so far as the claimed source of the statutory entitlement is concerned—there, it was § 221(d)(3) of the National Housing Act, here, the New York local rent control laws. And, of course, as a comparison of *Burr* and *Grace Towers* itself demonstrates, the claimed source of the entitlement is the crucial concern in the analysis of the due-process issue.

The Rent Stabilization Law of 1969 was enacted explicitly for the benefit of New York City tenants as a means to control a perceived penchant toward unreasonably high rent increases on the part of landlords. The New York City Council found that many owners of non-rent-controlled buildings were "demanding exorbitant and unconscionable rent increases" as a result of the housing shortage existing in the City of New York and that "such increases and demands [were] causing severe hardship to tenants of such accommodations and [were] uprooting long-time city residents from their communities." N.Y.C.Admin.Code § YY51–1.0. Although the coverage of the RSL was considerably narrowed during the early 1970's, with the passage of the Vacancy Decontrol Law, its full applicability was restored in 1974 when New York City declared a housing emergency, pursuant to State enabling legislation (ETPA), asserting its judgment that the Vacancy Decontrol Law had resulted in detrimentally "sharp increases in rent levels in many instances" and its concern for the "special hardship" being borne by "persons and fam-

ilies occupying rental housing." N.Y.C. Council Res. No. 276; *Perth Realty Company v. Dovoll,* 358 N.Y.S.2d 619, 622 (Civil Ct.N.Y.Cty.1974).

Clearly, protection of the utmost import is afforded tenants under the RSL. A basic level of fair rent increase is established by the Rent Guidelines Board. Even where a landlord is successful in his application for a "hardship increase," such increase, expressed as a percentage of gross rents, is subject to built-in limitations. First, it is computed according to a strict statutory formula, which was rendered even stricter, from the standpoint of the landlord, by action of the New York State Legislature in 1975 (the "3 plus 3" formula). Second, it must be applied uniformly among all dwelling units. RSC § 37. Third, it is collectible to a maximum of 6 percent in any one year, with any excess "to be spread forward in similar increments and added to the stabilized rents as established or set in future years." RSC § 43. Finally, such increase is allowable only once every 36 months. RSC § 36.

Under the RSL, additionally, mechanisms are provided for tenants to act upon violations of the law by landlords, § YY51–6.-0(b)(3), and for sanctions against landlords if necessary. § YY51–6.0(c)(10), (11).

■ Tenants are unquestionably the intended beneficiaries of the New York City rent control laws, and the benefit of which they partake is a carefully controlled system of rental increases—one which is continuously solicitous of the tenant interest, to a substantial extent irrespective of the financial effect on the landlord. The tenants of Gramercy Spire Apartments thus have a statutory entitlement to have their rents computed in accordance with the Rent Stabilization Law and the Emergency Tenant Protection Act—theirs, in other words, is a "property" interest subject to procedural due process protection. See, *Argo v. Hills, supra; 515 Associates v. City of Newark, supra.*

The action of HUD in this case was such as to deprive the tenants of that interest and certainly constituted sufficient governmental involvement to invoke the due process clause of the Fifth Amendment. *Argo v. Hills, supra; 515 Associates v. City of Newark, supra.* Compare *Langevin v. Chenango Court, Inc., supra.* Gross monthly rental income allowable to Associates was substantially increased under the April 6 preemption order, and approximately 92 percent of the tenants residing in the building had their rents raised in excess of 6 percent. The percentage increase in gross monthly rental income was not applied uniformly among dwelling units but, rather, was imposed so as to fluctuate widely within the range of 0 to 20 percent. Finally, the tenants were placed upon notice of Associates' right under the preemption order to apply for rental increases from HUD annually.

■ Defendants have directed the Court's attention to a provision in the RSL, excluding from its coverage "dwelling units * * * aided by government insurance under any provision of the National Housing Act, *to the extent this local law or any regulation or order issued thereunder is inconsistent therewith * * *.*" § YY51–3.0(a)(3) (emphasis added). Defendants appear to argue that the provision eviscerates any possible "property interest" under the RSL for tenants of HUD-insured housing. The Court disagrees. The "inconsistency" of which the statute speaks has been given content by HUD itself, in its local rent control regulation. Where, as here, an unsubsidized insured project is involved, an inconsistency between state and federal law will arise only upon a finding of jeopardy to HUD's economic interest. Absent such a finding, tenant protection under the local rent control laws is respected. The jeopardy determination involves a careful assessment of the mortgagor's financial position by both the local HUD office and the Office of Loan Management. 24 C.F.R. § 403.6(d), (e). Thus tenant protection under the local rent control laws is not arbitrarily terminable by the federal government. Compare *Bishop v. Wood, supra,* at 345–47, 96 S.Ct. 2074. Rather, it exists unless and until a determination is reached, after a two-tier

review, that "federal interests [are] sufficiently imperiled to invoke the principle of federal supremacy" (Pfaender Affidavit at 4). Under these circumstances, it appears clear to the Court that, notwithstanding the preemptive power of the federal government, the New York City rent control laws confer a constitutionally protected property interest upon tenants. That that interest is defeasible in the event of an actual determination of conflict with the NHA—and, indeed, is recognized so to be by the RSL itself—does not, in the Court's view, render the property right illusory.

Nor does the New York case law cited by defendants alter the Court's determination of the existence of a property interest on the part of the Gramercy Spire tenants. *Bedford Building Co. v. Beame*, 38 N.Y.2d 729, 381 N.Y.S.2d 38, 343 N.E.2d 756 (1975); *Wasservogel v. Meyerowitz*, 300 N.Y. 125, 89 N.E.2d 712 (1949); *Colosi v. Starr*, 85 Misc.2d 797, 381 N.Y.S.2d 389 (Sup.Ct. Queens Cty. 1976); *Richardson v. Starr*, 85 Misc.2d 476, 378 N.Y.S.2d 248 (Sup.Ct. Kings Cty. 1975). The comment in *Wasservogel* that the tenants were not deprived of "property" or a "vested right" in having their rents raised has no significance for the present case. First, under the due process clause as interpreted by *Roth* and subsequent decisions, see, e. g., *Goss v. Lopez*, *supra*, state-created property interests are derivable in large degree from existing legislation. Where, as here, such a statutory entitlement is at issue (under 1969 and 1974 laws), the general phrasing of a decision of twenty years' vintage interpreting unrelated legislation has no pertinence. Second, as far as the Court has been shown, *Wasservogel's* current application in New York is simply to support the proposition that New York tenants are not constitutionally entitled to participate in rent adjustment procedures under the rent control laws. *Bedford Building Co. v. Beame*, *supra*; *Colosi v. Starr*, *supra*; *Richardson v. Starr*, *supra*. But that fact is irrelevant. The implicit assumption of the cases cited is that the tenants *are* entitled to the general benefit and protection of those laws and to have their rents computed in accordance there-

with—regardless of the fact that they are denied a right of participation in the internal adjustment procedures. It is *that* entitlement which the tenants have claimed in the present case and which the federal government has sought to extinguish. Finally, the Court finds it persuasive that the City of New York itself—through the Housing and Development Administration—has strenuously urged the existence of a property right under the RSL.

The Court turns its attention to the procedural guarantees to which the tenants are entitled. The cases, including those from the Second Circuit, appear to be unanimous that, where the matter in dispute is the appropriateness of a rental increase affecting a large class of tenants, a "full adversary-type hearing" is inappropriate and unnecessary. *Grace Towers Ten. Ass'n v. Grace Hous. Dev. Fund Co.*, *supra*, at 495. See *Geneva Towers Tenants Org. v. Federated Mortgage Inv.*, *supra*, at 491–92; *Thompson v. Washington*, 162 U.S.App.D.C. 39, 497 F.2d 626, 640–41 (1973); *Burr v. New Rochelle Municipal Housing Authority*, *supra*, at 1168–70; *Argo v. Hills*, *supra*, at 158–59; *515 Associates v. City of Newark*, *supra*, at 994–96. Instead, the courts have sanctioned a more limited form of participation. Under the present circumstances, the following procedural safeguards are appropriate: (1) notice to the tenants at the time of the landlord's filing an application for a rental increase, pursuant to 24 C.F.R. § 403.6; (2) an opportunity for the tenants to inspect the materials sent to HUD in support of the application; (3) an opportunity for the tenants to submit opposing materials to HUD in written form; and (4) a written statement from HUD setting forth the reasons underlying its preemption decision. Similar safeguards were suggested by the courts in *Argo v. Hills*, *supra*, and *515 Associates v. City of Newark*, *supra*.

In this case, of course, as the present record demonstrates, the tenants were afforded no input into the decision-making process. The HUD preemption determination was based solely upon material sub-

828

mitted by Associates during 1975 and 1976
—income and expense statements, rent rolls
and other "interpretive" material. Indeed,
the tenants were not notified of the rental
increase until more than a month after the
preemption order issued.

For the reasons stated, the Court grants
Associates' motion for summary judgment
solely on the issue of the validity of the
preemption regulation and its inconsistency
with the local rent control laws. All other
aspects of the motion—including the re-
quest for a preliminary injunction—are de-
nied. In view of the Court's disposition, it
is unnecessary to consider Associates' re-
quest to maintain a class action. The Court
grants plaintiff's and HDA's cross-motions
for summary judgment on the due process
claim and remands the case to HUD for
further proceedings in which the tenants of
Gramercy Spire Apartments will be afford-
ed the procedural safeguards to which they
have been held constitutionally entitled.
HUD will assume the responsibility of for-
mulating specific procedures and timetables
consistent with this opinion.

SO ORDERED.